# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 2, 2026        Decided July 31, 2026

No. 25-5111

UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN
RESERVATION,
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00546)

———

*Jeffrey S. Rasmussen* argued the cause for appellant. With
him on the briefs was *Jeremy J. Patterson*.

*Mary Gabrielle Sprague*, Attorney, U.S. Department of
Justice, argued the cause for appellees. With her on the brief
were *Adam R.F. Gustafson*, Principal Deputy Assistant
Attorney General, and *Amber Blaha*, Attorney. *Christopher
Anderson*, Attorney, U.S. Department of Justice, *Kathy A.
Davis*, Assistant Attorney General, Office of the Attorney
General for the State of Utah, and *Steve Geary*, Assistant
Solicitor General, entered appearances.

Before: SRINIVASAN, *Chief Judge*, KATSAS, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  The Indian Reorganization Act of 1934 authorizes the Secretary of the Interior to restore certain reservation lands to tribal ownership.  This case concerns whether lands within the Uncompahgre Reservation in Utah are eligible for restoration.  The Department of the Interior concluded that they are not, as did the district court.  So do we.

I

In the nineteenth century, the United States reserved large sections of land for exclusive use by Indian tribes.  *See Hagen v. Utah*, 510 U.S. 399, 412 (1994); *Solem v. Bartlett*, 465 U.S. 463, 466 (1984).  But late in that century, Congress pursued a policy of "allotting those lands to tribe members individually." *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992).  Allotment was designed to "force the assimilation of Indians into the society at large," *id.*, and to "open up unallotted lands for non-Indian settlement," *Solem*, 465 U.S. at 467.  Sometimes, Congress accomplished allotment through "surplus land acts" specific to individual tribes or reservations.  *Id.*  But in 1887, Congress broadly prohibited individual Indians from selling their allotted lands.  *See County of Yakima*, 502 U.S. at 254.  Going forward, allotted land was either "owned by the United States in trust for an Indian" or "owned by an Indian subject to a restriction on alienation."  Cohen's Handbook of Federal Indian Law § 18.02 (N. Newton & K. Washburn, eds., 2024).

3

In 1934, the Indian Reorganization Act (IRA) ended the practice of allotment. *County of Yakima*, 502 U.S. at 255. That Act sought "to restore the principles of tribal self-determination and self-governance that [had] prevailed before" allotment. *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 558 (2018) (cleaned up). The IRA halted further allotments, and it extended indefinitely the trusts in which the United States held allotted lands for individual Indians. 25 U.S.C. §§ 5101–02. As a result, Indian reservations today often contain lands held in trust by the United States, as well as privately held lands. *Upper Skagit Indian Tribe*, 584 U.S. at 558–59.

Most relevant here, the IRA provides a mechanism for tribes to claim ownership of certain reservation lands:

> The Secretary of the Interior, if he shall find it to be in the public interest, is authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States ….

25 U.S.C. § 5103(a).

## II

The Ute Indians historically lived in parts of Colorado, Utah, and New Mexico. The Ute included several distinct subgroups or bands. The Ute Indian Tribe of the Uintah and Ouray Reservation includes descendants of three distinct subgroups, including the Uncompahgre Band. Today, the Tribe has jurisdiction over the Uncompahgre Reservation in Utah. In this litigation, the Tribe invokes the IRA to obtain ownership of land within it. To evaluate this request, we must

survey a series of nineteenth-century agreements between different Ute bands and the United States.

A

In the 1860s, the Utes relinquished by treaty claims to any land outside of Colorado. In 1863, the Uncompahgre Band (then known as the Tabeguache) "cede[d], convey[ed], and relinquish[ed] all of their claim, right, title, and interest in and to any and all of their lands within the territory of the United States," except for a hunting area in Colorado. *See* Treaty with the Tabeguache Indians, Tabeguache Band of the Ute Indians-U.S., Oct. 7, 1863, Art. II, 13 Stat. 673, 674, 677 (1863 Treaty). In 1868, several Ute bands, including the Uncompahgre, agreed to be bound by the 1863 Treaty in exchange for the United States reserving a tract of land in Colorado for their sole use. *See* Treaty with the Ute Indians, Tabeguache Band of the Ute Indians et al.-U.S., Mar. 2, 1868, Arts. I–II, 15 Stat. 619, 619–20 (1868 Treaty). These bands "relinquish[ed] all claims and rights in and to any portion of the United States or Territories," except as to the Colorado lands reserved for them by the treaty. *Id.* Art. III, 15 Stat. at 620. This agreement left the Utes with "a reservation of approximately 15.7 million acres lying wholly within Colorado." *United States v. S. Ute Tribe or Band of Indians*, 402 U.S. 159, 162 (1971). We refer to this land as the Colorado Reservation.

Disputes under the 1868 Treaty soon arose. In 1874, the reservation was shrunk after valuable mineral deposits were discovered there. *S. Ute Tribe or Band of Indians*, 402 U.S. at 162. Around the same time, trespasses by non-Indians into the Colorado Reservation became common. *See Ute Indian Tribe v. Utah*, 521 F. Supp. 1072, 1096 (D. Utah 1981), *aff'd in part, rev'd in part*, 773 F.2d 1087 (10th Cir. 1985) (en banc). In 1879, a group of Utes killed Indian Agent Nathan Meeker and

several other federal officials stationed in the Reservation at White River, Colorado, in an attack dubbed the Meeker Massacre. *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 174 (1947). "Congress, aroused by the massacre, took steps to punish the Indians who participated in it, to dispossess the Utes of their reservation, and to remove them from Colorado." *Id.*

One such step was what we will call the 1880 Act, which is central to this case. Section 1 of that Act ratified a settlement in which three Ute bands, including the Uncompahgre, agreed to "the sale to the United States of their present reservation in the State of Colorado" and to their "settlement upon lands in severalty." An Act to Accept and Ratify the Agreement Submitted by the Confederated Bands of the Ute Indians in Colorado, for the Sale of their Reservation, 21 Stat. 199, 199 (June 15, 1880). Except as provided in the settlement, the bands "consent[ed] to cede to the United States all the territory of the present Ute Reservation in Colorado." *Id.* at 200. The Uncompahgre agreed to "remove to and settle upon agricultural land" near the Colorado and Gunnison Rivers—an area within the boundaries of the Colorado Reservation—"if a sufficient quantity of agricultural land shall be found there." *Id.* And if not, the Uncompahgre agreed to "remove to and settle upon" suitable agricultural land in Utah. *Id.* The Southern Utes similarly agreed to settle in a different area within the Colorado Reservation or, "if there should not be a sufficiency of such lands" there, in an area in New Mexico. *Id.* Only the White River Utes, who were thought to be most responsible for the Meeker Massacre, were forced to leave Colorado unconditionally. *Id.* For its part, the United States agreed to make allotments for Utes in the settling bands in the specified areas—*i.e.*, to set apart those lands and "cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty," leading to individual Utes holding their

6

land "in fee simple." *Id.* at 200–01. The United States also agreed to set aside certain funds to support the bands. *Id.* at 201. And it agreed to compensate individual Utes for any "improvements" made "upon any part of the reservation in Colorado to be ceded to the United States." *Id.*

Section 3 of the 1880 Act implements the settlement. It required the Secretary of the Interior to survey land in the areas specified in the agreement and to make the agreed-upon allotments. 21 Stat. at 203. Then, it provided that "all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands." *Id.* Section 3 then specified how the proceeds of these land sales would be distributed: After the United States was reimbursed for certain outlays, the "remainder" was to be "deposited in the Treasury … for the benefit of the [settling] Indians." *Id.* at 203–04. Giving a tribe the right to proceeds from a sale of lands— including by holding the proceeds for the tribe's benefit— confers what has become known as "compensable title." *See Confederated Bands of Ute Indians*, 330 U.S. at 179; J.A. 350.

After federal officials determined that Colorado lands would not suffice for the Uncompahgre, President Arthur issued an 1882 Executive Order setting apart lands in Utah "as a reservation for the Uncompahgre." J.A. 115. The tract, which covered 1.9 million acres, became known as the Uncompahgre Reservation. In 1894 and 1897, Congress enacted statutes authorizing and then requiring the allotment of parcels within that Reservation to implement the 1880 Act. *See An Act Making Appropriations for Current and Contingent Expenses of the Indian Department and Fulfilling Treaty*

Stipulations with Various Indian Tribes, 28 Stat. 286, 337 (Aug. 15, 1894) (1894 Act); An Act Making Appropriations for the Current and Contingent Expenses of the Indian Department and Fulfilling Treaty Stipulations with Various Indian Tribes, 30 Stat. 62, 87 (June 7, 1897) (1897 Act).

Of the 1.9 million acres in the Uncompahgre Reservation, the government allotted about 12,500 acres, and it sold off some 400,000 acres of unallotted land. The remaining 1.5 million acres of unallotted reservation land, which the government still administers, are the focus of this dispute.

B

In 2016, the Tribe asked the Department of the Interior to restore these 1.5 million acres to tribal ownership under the IRA. The Department denied the request on the ground that the IRA permits restoration of only those lands for which a tribe has compensable title. According to the Department, the Tribe lacked such title because none of the relevant treaties, statutes, or executive orders entitled the Tribe to proceeds from the sale of unallotted lands in the Uncompahgre Reservation.

The Tribe sued the Department to challenge the denial, and Utah intervened as a defendant. Before the district court, all parties agreed that lands may be restored under the IRA only if "a tribe would be entitled to the proceeds of [its] sale"—in other words, only if a tribe held compensable title. *Ute Indian Tribe of Uintah & Ouray Rsrv. v. Dep't of Interior*, 775 F. Supp. 3d 75, 79 (D.D.C. 2025). The district court held that "the Tribe has no compensable title to the government-managed land in the Uncompahgre Reservation." *Id.* at 76. The court thus granted the defendants' motions for summary judgment and denied the Tribe's cross-motion.

The Tribe now appeals.

8

III

We review grants of summary judgment *de novo*, with no deference to the district court. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1082 (D.C. Cir. 2017). And we review administrative interpretations of statutes *de novo*, with no deference to the agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401–02 (2024).

The IRA permits the Secretary of the Interior to restore to tribal ownership any "remaining surplus lands of [an] Indian reservation heretofore opened." 25 U.S.C. § 5103(a). We have held that the phrase "remaining surplus lands" refers to lands in which a tribe has compensable title—in other words, land that, if sold, would generate proceeds held for the benefit of the Indians. *Rundle v. Udall*, 379 F.2d 112, 113 (D.C. Cir. 1967) (per curiam) (citing *Bowman v. Udall*, 243 F. Supp. 672, 683 (D.D.C. 1965)). That much is common ground here.

The parties vigorously dispute whether the Tribe has compensable title to land held by the United States in the Uncompahgre Reservation in Utah. According to the government, the 1880 Act gave the Tribe compensable title only to lands within the Colorado Reservation. According to the Tribe, the 1880 Act gave it compensable title to the lands where the Uncompahgre Band would be resettled, which turned out to be the reservation in Utah. We agree with the government: Because the Tribe lacks compensable title to lands within the Uncompahgre Reservation, those lands are ineligible for restoration under the IRA.[1]

---

[1] The IRA requires the Secretary to determine whether restoration of eligible lands is "in the public interest." 25 U.S.C. § 5103(a). The Secretary did not address this question. Nor do we.

9

A

Section 3 of the 1880 Act gives the Tribe compensable title to *some* lands, in directing that the proceeds from certain land sales be deposited into the Treasury for the benefit of Indians. The question is whether those lands fall within the Colorado Reservation or the Uncompahgre Reservation in Utah. Text, structure, and historical context all point towards compensable title limited to the Colorado Reservation.

Section 3 implements the agreement between the settling Ute bands and the United States. Broken apart for ease of reference, section 3 provides in pertinent part:

> [1] the Secretary of the Interior [is] authorized to cause to be surveyed … a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided. And upon the completion of said survey … [the government] shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement …

> [2] and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands …

> [3] and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at one dollar

and twenty-five cents per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement.  And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians …

[4] *Provided further*, That the subdivisions upon which are located improvements to be appraised … shall be offered to the highest bidder at public sale … and the same shall be absolutely reserved from occupation or claim until so sold.

21 Stat. at 203–04.

The basic operation of section 3 is clear enough.  Clause [1] provides for allotments to resettle the Ute bands.  Clause [2] provides for the sale of certain reservation lands "not so allotted."  Clause [3] governs disposition of sale proceeds, including by setting aside funds for the benefit of Indians.  And clause [4] sets forth special rules for tracts where individual Utes made improvements.  This case turns on what are the clause [2] "lands not so allotted," for which clause [3] provides at least some compensable title.

In our view, one textual consideration resolves this case.  The land sales addressed in clauses [2] and [3] cover only those unallotted lands "released and conveyed to the United States" through the agreement ratified in the 1880 Act.  21 Stat. at 203.  None of those lands were in Utah.  As the Supreme Court has explained, "[t]he only lands for which Congress agreed in 1880 to compensate the Indians were those that 'the title to which' the Indians then 'released and conveyed to the United States.'"  *Confederated Bands of Ute Indians*, 330 U.S. at 178 (quoting 1880 Act, 21 Stat. at 203).  The Tribe "could only release and convey the lands that belonged to them, and only the lands given to them by the original 1868 treaty belonged to them."

*Id.* Those lands were "wholly within Colorado," inside the bounds of the Colorado Reservation. *S. Ute Tribe or Band of Indians*, 402 U.S. at 162; *see* 1868 Treaty, 15 Stat. at 619–20. Accordingly, compensable title did not extend to the Uncompahgre Reservation where the Band later relocated.

Contextual considerations confirm our reading of section 3. For one thing, section 3 of the 1880 Act focuses primarily on the Colorado Reservation: Clause [1] addresses allotments that, for the Uncompahgre and Southern Bands, were expected to occur within that Reservation, and clause [4] addresses improvements made by the Utes to particular tracts within the Colorado Reservation. *See* 21 Stat. at 200, 203–04. To be sure, clause [1] also contemplated allotments for the White River Ute within an extant Utah reservation. *Id.* at 200. But that reflected distinctively harsh punishment for the band thought most responsible for the Meeker Massacre. *See Confederated Bands of Ute Indians*, 330 U.S. at 178. We have no reason to think that the greater anticipated relocation of the White River Band was a vehicle for extending compensable title to all the bands for any land outside the Colorado Reservation. Moreover, clause [3] requires the *Utes* to pay the United States "one dollar and twenty-five cents per acre" for any allotted land given to them outside the Colorado Reservation. *See* 21 Stat. at 204. As the district court aptly noted, it is quite implausible to construe the 1880 Act "as both (1) freely giving the Uncompahgre Utes title to land in Utah not allotted to them while (2) requiring them to pay for the land allotted to them." *Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 775 F. Supp. 3d at 83. The 1894 Act, which specifically authorized allotments within the Uncompahgre Reservation, retained the same requirement that the Indians "pay one dollar and twenty-five cents per acre for said lands" within that Reservation. *See* 28 Stat. at 337. And the payments were to be taken "from the fund now in the United States Treasury realized from the sale of their

lands in Colorado." *Id.* These provisions would make no sense if the Tribe held compensable title in lands within the Uncompahgre Reservation.

## B

The Tribe's various counterarguments are unpersuasive.

### 1

The Tribe repeatedly asserts that the 1880 Act entitled it to a "replacement Reservation." Appellant's Br. at 6. The Tribe also contends that section 1 of that Act provided for its "rights in the 1868 Treaty" to be "carried over" to that new reservation. *Id.* Because the Tribe had compensable title in the Colorado Reservation, the Tribe reasons, it must also have compensable title in the replacement Uncompahgre Reservation.

This line of reasoning has many flaws. Most obviously, the 1880 Act did not require any new reservation for the Tribe; instead, it provided for the opposite, with individual allotments "divided among the said Indians in severalty" and leading to "fee simple" property interests. 21 Stat. at 200–01. As the Supreme Court explained: "The central feature of the Act of 1880 was the termination of tribal ownership in the reservation lands, and the limitation of Indian ownership to such lands as might be allotted in severalty to individual Indians." *S. Ute Tribe or Band of Indians*, 402 U.S. at 163. So although President Arthur created a new reservation in 1882, "[n]othing in the 1880 Act required him to do so." *Ute Indian Tribe v. State of Utah*, 773 F.2d 1087, 1097 (10th Cir. 1985) (en banc) (Seymour, J., concurring) (majority of judges joining). The Tribe does not contend that the 1882 Executive Order itself created compensable title, nor could it. *See Confederated Bands of Ute Indians*, 330 U.S. at 176 ("the President had no

authority to convey to the [Utes] a compensable interest in the lands described").

As for section 1 of the 1880 Act, it merely ratified an agreement that the 1868 Treaty would remain in effect except as "altered by" the Act. 21 Stat. at 201. For example, Article VI of the 1868 Treaty, which requires the United States to compensate individual Uncompahgre harmed by "bad men among the whites," 15 Stat. at 620, still remains effective on the Uncompahgre Reservation, *Jones v. United States*, 846 F.3d 1343, 1359–61 (Fed. Cir. 2017). But that says nothing about the Tribe's *land* rights. And as explained above, the 1868 Treaty itself ceded all Uncompahgre land claims outside the Colorado Reservation, and the 1880 Act ratified an agreement in which the Uncompahgre ceded that reservation in exchange for individual allotments.

2

The Tribe further invokes an 1887 statute granting the Utah Midland Railway Company a right "to locate, construct, own, equip, operate, use, and maintain a railway, telegraph, and telephone line through" the Uncompahgre Reservation. An Act Granting the Utah Midland Railway Company the Right of Way Through the Uncompahgre and Uintah Reservations, § 1, 24 Stat. 548, 548 (Mar. 3, 1887) (1887 Act). This Act required "compensation to be paid [to] the Indians for such right of way," as well as "compensation to be made individual members of the tribe for damages sustained by them by reason of the construction of said road." *Id.* § 3, 24 Stat. at 549. The Tribe reasons that this compensation scheme makes sense only if the Tribe had pre-existing compensable title to unallotted lands in the Uncompahgre Reservation.

Again, we must disagree. By its terms, the 1887 Act makes no reference to any kind of tribal property interest. To

the contrary, it requires compensation for individual Indians harmed either personally or in the enjoyment of their own individual property on allotted lands. Moreover, as the district court explained, Congress could have intended the 1887 Act to compensate Indians merely "for suffering the inconvenience of the railway." *Ute Indian Tribe of Uintah & Ouray Rsrv.*, 775 F. Supp. 3d at 79 n.2. In other words, the statute could protect Indians who "merely occupied the land" temporarily, *id.*, just as nuisance law protects tenants who have only a temporary right to occupy their rental property, *see*, *e.g.*, *Gaetan v. Weber*, 729 A.2d 895, 898 (D.C. 1999) (citing Prosser & Keeton on Torts 621 (5th ed. 1984)). Furthermore, "clear and manifest" language is required to effect an implied repeal. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). And we cannot use "confusion" in a "subsequent legislative record" to override "clear" text in an earlier statute—even in an earlier statute diminishing the boundaries of an Indian reservation. *See Hagen*, 510 U.S. at 420. So any ambiguity in the 1887 Act cannot override clear text in the 1880 Act. And as shown above, the 1880 Act gave the Uncompahgre compensable title only over the Colorado Reservation lands that were ceded and then sold off under that statute.[2]

---

[2] The Tribe advances many less substantial historical arguments. For instance, it invokes a statute that governed the Uintah Reservation, a Utah reservation different from the one at issue here. *See* 25 Stat. 157 (May 24, 1888). It also invokes legislative debates from the 1890s, which at the very most show conflicting views about the Tribe's title to the Uncompahgre Reservation. *Compare* Letter from Comm'r of Indian Affs. Morgan to Sec'y of the Interior Noble 2–3, 8 (Dec. 30, 1892), https://perma.cc/DB28-FLRS; 26 Stat. 794, 795 (Feb. 28, 1891), *with Ute Indian Tribe*, 521 F. Supp. at 1101. Such evidence affords no basis for reinterpreting clear text in the 1880 Act.

15

3

The Tribe further argues that it must have compensable title in the Uncompahgre Reservation because, according to the Tenth Circuit, those lands remain an Indian reservation subject to tribal jurisdiction and governance. *See Ute Indian Tribe of the Uintah v. Myton*, 835 F.3d 1255, 1258–60 (10th Cir. 2016). But reservation status, which the 1882 Executive Order created, does not entail compensable title. To the contrary, reservations are places where tribes rather than states may govern, but they are not necessarily places where tribes or their members own all the land. *See* Cohen's Handbook § 4.04. The Supreme Court has long recognized that a tribe's jurisdiction exists "independently of any question of title." *United States v. Thomas*, 151 U.S. 577, 585 (1894). A majority of the Tenth Circuit, in holding that the Uncompahgre Reservation remains an Indian reservation subject to the Tribe's jurisdiction, stressed that "title and reservation status are not congruent concepts." *See Ute Indian Tribe*, 773 F.2d at 1097 (Seymour, J., concurring). And far from supporting the Tribe's position on the title question, the Tenth Circuit affirmatively foreclosed it. As that Court explained, the 1882 Executive Order, in creating the Uncompahgre Reservation, "in no way interfered with Congress' intent that the Uncompahgres hold no title to the land." *Id.*

4

Finally, the Tribe invokes canons to the effect that ambiguous statutes or treaties must be construed in favor of Indians or as Indians would have understood them. But these canons have no application where the relevant law is unambiguous. *See Negonsott v. Samuels*, 507 U.S. 99, 110 (1993). Indeed, the Supreme Court has twice invoked the clear language of the 1880 Act to foreclose land claims similar to the

one that the Tribe asserts here, despite the Indian canons of construction. In *Southern Ute Tribe or Band of Indians*, the Court did "not doubt that the Southern Utes regarded the lands they occupied as 'our reservation,'" but it nonetheless "fail[ed] to see how this nullifies the conveyance … made by the Act of 1880." 402 U.S. at 169. Likewise, in *Confederated Bands of Ute Indians*, the Court held that the 1880 Act foreclosed a claim that various Ute bands had an ownership interest in another reservation later created by executive order. *See* 330 U.S. at 176–80. The Court summed up: "We cannot, under any acceptable rule of interpretation, hold that the Indians owned the lands merely because they thought so." *Id.* at 180. So too here.[3]

## IV

For these reasons, we affirm the grant of summary judgment for the federal defendants and the State of Utah.

*So ordered.*

---

[3] Because we conclude that the 1880 Act created no compensable title in the Uncompahgre Reservation, we do not consider the district court's alternative holding that the 1894 and 1897 Acts took away any compensable title otherwise held by the Tribe. *See Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 775 F. Supp. 3d at 83–86.